SOUTH PORTO RICO SUGAR CO., Petitioner, *v.* PUERTO RICO SUGAR BOARD, Respondent; ADRIANA L. MERCADO PARRA, Intervener.

No. 34. Submitted April 22, 1960.—Decided June 6, 1961.

---

*James R. Beverley, R. Castro Fernández,* and *Francisco Castro Amy* for petitioner. *Alejandro Romanace* for respondent. *Pedro M. Porrata, Charles Cupril Oppenheimer,* and *José Trías Monge* for intervener.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

We have before us, once more, a controversy relating to the petitions for the shifting of the place for the grinding of cane in the sugar industry. In 1956, colono Santiago Sambolín Becchi signed a contract of agricultural financing and grinding of cane with the South Porto Rico Sugar Co. in which he promised to grind the cane from his thirty farms, for the years 1956 to 1960, both inclusive, in the Central Guánica, owned by the aforesaid corporation. In exchange, the latter promised to lend him annually, $3.00 for each ton of cane as quota for the planting and cultivation of certain farms, $2.50 for the remaining farms, and $3.00 per ton of cane as quota for cutting and hauling the cane produced in all the farms. Clause 17 of the contract provided the following:

"It is understood by the parties, that the Central has agreed to finance the Colono in the aforesaid manner considering the obligation contracted by the Colono of selling and delivering to the Central, the cane produced in the farms described in this deed during the entire term of this contract, and it must not be understood that the Colono is relieved from said obligation because he has paid or does not owe to the Central any agricultural advance payments."

The contract was duly recorded in the Registry of Agricultural Contracts.

The parties signed, on that same date, a private contract in which "and as an additional consideration" to the colono's aforesaid obligations, the petitioner agreed to pay a compensation of twenty cents for each ton of *nobles* canes delivered to the petitioner during the five grinding seasons.[1] The petitioner lent to the colono the sum of $40,000 for the

---

[1] Neither the contract nor any other evidence makes it clear whether or not it is an additional compensation to those provided by the Sugar Act. The Board did not decide the matter and the parties do not agree in their interpretation.

1957 crop and paid him said year the aforesaid additional compensation.

In 1957 Sambolín leased his properties to Adriana L. Mercado for a period of twenty years with an option to an additional ten years and he informed her of the obligations contracted by him in the advance crop-loan contract. At the time of the lease, Sambolín was not indebted to the South Porto Rico Sugar Co. He had paid in cane, to date, his crop-loan debt.

That same year the new colono submitted a letter to the Sugar Board requesting that she be allowed to shift the grinding of the cane produced on the leased properties, from the Central Guánica to the Central Rufina, owned by Mario Mercado and Sons, *S. en C.* The South Porto Rico Sugar Co. objected to said petition invoking the contract signed by Sambolín. After the usual proceedings and with the participation of all interested, the Board entered an order approving the change of the place for grinding for the following reasons: 1. the colono Sambolín was not indebted to the petitioner nor had the latter given him any advanced payment for the 1958 crop; 2. in this situation and pursuant to what was decided by the Board and by this Court in *Central San Vicente, Inc.* v. *Sugar Board* (Appeal for Review No. 12, *Per Curiam* decision of January 27, 1956) and in *Mayagüez Sugar Co.* v. *Sugar Board*, 79 P.R.R. 401 (1956), the obligation contracted by Sambolín of grinding his cane in the Central Guánica does not prevail; and 3. Section 4(7) of the Regulation of the Board (5 R. & R.P.R. § 391-4) does not preclude that the change be authorized.

After taking the proper steps for reconsideration, the South Porto Rico Sugar Co. filed the petition for review before this Court and we issued the corresponding writ. Subsequently, and with the consent of all the parties and the posting of bond by the petitioner to answer for all possible damages, we stayed the Board's order.

 Before discussing in detail petitioner's contention we should examine the applicable law and the interpretative decisions. Section 3 of the Sugar Act provides (Act No. 426 of May 13, 1951, Sess. Laws, p. 1138; 5 L.P.R.A. §§ 371–405):

"No sugar central shall refuse to grind the cane of a *colono* or of his successors or successors in interest, who may have been a *colono* of said central during any of the three (3) years prior to the date on which he may offer said cane to be ground, and the central shall give preference to said *colonos* for grinding their cane over the new *colonos; Provided,* That in such cases where a *colono* shall have been a *colono* for two or more centrals, the central shall be bound to grind the proportional part of the crop which said *colono* delivered to said central to be ground during the last year in which he was a *colono* thereof.

For a *colono* to be entitled to shift from the central where he grinds his canes to another central, he shall be under obligation to notify the centrals concerned of his intention to make said change not later than the first day of November prior to the grinding season in which he desires to make such change.

The central shall be bound to grind the cane of the new *colonos,* unless the Board exempts the central from such obligations after it is shown to the Board that the central lacks sufficient capacity to assume the grinding of the cane from such *colonos.* (5 L.P.R.A. § 372.)

And § 21 adds:

"In addition to the preceding powers expressly listed herein, the Board shall be authorized to prescribe such rules and regulations as may not be incompatible with the provisions of this Act for the proper execution hereof, and it shall be its duty to enforce, execute and carry out, through its orders, directives, regulations or otherwise, all the provisions of sections 371–405 of this title and of the full intent thereof, and shall be empowered to revoke or modify such orders, decisions or regulations". (5 L.P.R.A. § 390.)

Construing the aforesaid § 3 we have decided that: 1. an order by the Board authorizing a shift of grinding is valid even when the colono has signed a grinding contract binding himself to grind his canes, "hereafter" in a mill

and the latter objected to the shifting—*Central San Vicente, Inc.* v. *Sugar Board,* 78 P.R.R. 760 (1955); 2. said order is equally valid if rendered prior to the expiration date of a simple grinding contract for a term of two years, and in which the only aid given by the mill to the colono is an advance for cutting and hauling for each ton of cane that the colono delivers to the mill, which contract, besides, is void because its provisions are repugnant to the Sugar Act —*Mayagüez Sugar Co., Inc.* v. *Sugar Board,* 78 P.R.R. 844 (1956); *cf. Mayagüez Sugar Co., Inc.* v. *Sugar Board,* 79 P.R.R. 401 (1956); and 3. said order is valid also when it is a crop-loan and grinding contract in which the parties expressly included "all the rules and provisions of the Act creating the Sugar Board" and, therefore, they recognized the colono's right to shift from a central upon complying with the notification requirement—*Central San Vicente, Inc.* v. *Sugar Board,* Appeal for Review No. 12, *Per Curiam* decision of January 27, 1956.

The petitioner herein alleges that: 1. this is the case of a crop-loan and grinding contract; 2. in view of the express obligation contained in the clause seventeen of the contract, it is unimportant whether the colono has paid the debt because "his main obligation of grinding the cane at the Central Guánica for the remaining seasons covered by the contract, which obligation precisely led the Central to bind itself to advance the crop loans for all the seasons, under the contract" was still outstanding; 3. the *Central San Vicente* case, *supra* is inapplicable because in that case the provisions of the Sugar Act had been expressly included in the contract, while in this case there is no such obligation; 4. Section 3 of the Sugar Act has no other scope than to recognize in the colono the right of choosing the mill which shall grind his cane and does not preclude the colono from negotiating said right for over a year; 5. there is no other provision in the aforesaid Act which prohibits grinding contracts for

more than one year nor does § 3 establishes that the right to shift from mills is unwaivable; 6. there is no interest or public policy which precludes a grinding contract for more than one year and, on the contrary, said contracts constitute an expression of colono's liberty to contract; 7. the colonos are not at a disadvantage in signing the crop-loan and grinding contracts with the mills, because the latter have the legal obligation to grind the colono's cane and to pay them the just compensation; 8. the crop-loan contracts enjoy special legislative protection which lends to obtain new source of credit for the colonos; 9. the act applicable to said contracts authorizes the execution thereof for periods over a year, offers them registration protection, extends said protection to the grinding contracts, provides for the specific performance of said contracts and for such purposes it grants the extraordinary remedy of an injunction; 10. the Board adopts a contradictory position when it denies the shifting of grinding if the colono has not paid his crop-loan debt and permits it when he has fully paid it.

These apt and sound contentions necessarily bind us to make a conscientious re-examination of the entire situation and to establish with the utmost possible clearness the rules that must govern.

The language of § 3 sheds a wavering light on the matter. It requires from the centrals: the obligation to grind the cane of those persons who might have been its colonos during any of the three previous years with a special provision for the other persons who might have been colonos for two or more centrals and, furthermore, the obligation of grinding the cane of the new colonos, unless the Sugar Board exempts them from such obligation for insufficiency of productive capacity. In regards to the colonos it only says the following: "For a colono to be entitled to shift from the central where he grinds his canes to another central, he shall be under obligation to notify the centrals concerned of his intention to

make said changes not later than the first day of November prior to the grinding season in which he desires to make such change." This provision merely explains that the colono has the right to shift the grinding [2] and if he decides to do so he must notify the centrals concerned, but it does not decide by itself whether said right may be object of a contract and on what conditions. The legislative history of the Sugar Act, which we have carefully studied, is of no help either.

The experience of the administrators of this Act is much more useful. Since the beginning the Sugar Board confronted these problems. It provided in its Regulation (5 R. & R.P.R. § 391-4) that the notification required by § 3 of the Act should be made in writing through the Board, the data that it should contain, the manner of sending such notices, the procedure to submit and decide the objections, and the procedure to be followed by the new colonos and new owners. As a last paragraph in said section the following was included:

"Nothing contained in the preceding paragraphs shall be interpreted in any manner whatsoever as restricting, modifying, or impairing any acquired right in harvest and grinding contracts duly authorized or in contracts of any other kind that are related to the grinding of the cane of the colono with the sugar mill, provided that said contracts are not contrary to the provisions of the Sugar Act".

In said paragraph the Board undoubtedly anticipated the view that § 3 of the Act does not constitute a *carte blanche* for the colonos to shift the grinding place at their

---

[2] "It is known that this section re-established the freedom of contract between centrals and *colonos* outside the original plan of production zones determined, by the Public Service Commission of Puerto Rico provided in § 4 of Act No. 221 of May 12, 1942, as amended by Act No. 383 of May 15, 1949 and regulated by the Regulations of Sugar Companies adopted by the Public Service Commission on June 29, 1946". (*Mayagüez Sugar Co., Inc.* v. *Sugar Board*, 79 P.R.R. 401, 402.)

will and with the only formality of a timely notification and that, on the contrary, in particular circumstances the obligations contracted in the crop-loan and grinding contracts and of other sorts, could constitute limitations to the practice of that autonomy. In view of the great diversity of situation which might arise, the Board wisely preferred to fix those limitations by means of the slow but more realistic proceeding of deciding each particular case. From among its most important decisions in this field we have picked out the following basic rules: 1. the freedom which § 3 grants the colonos may be waived when there is cause and the Board shall carefully examine the contract "specially as to the substantiality of the consideration and as to the fact that the latter represents the true *quid pro quo* of the contract". (Case of *Rodolfo Morales Pérez*, 0–6, p. 11, 1953); 2. the obligation of the central to grind the canes for the colonos is not sufficient consideration to deny a shift of grinding (Case of *Julio Rosado Cruz*, 0–4, 1953) not even when the grinding contract had been part of the contract of sale of the property. (Case of *Autoridad de Tierras*, 0–7, 1953); 3. Neither is it sufficient consideration that the central advances crop-loans to the colono without a contractual obligation and the central fixing the amount it would lend. (Case of *Ramiro Vázquez Colón*, 0–8, 1954); 4. the consideration also disappears when there is a crop-loan and grinding contract for several years but before its expiration, the colono pays what he owes and the central accepts the payment although it insist on the performance of the grinding contract (Case of *José Antonio Laborde*, 0–24, 1955); 5. if the colono is indebted to the central by reason of crop loans, the consideration which ties him to the central subsists and the shift of grinding is not approved until the debt is fully paid (Case of *Luis G. Cestero*, 1957; and 6. the same previous rule applies when the colono offers to pay the crop-loan debt in cash but the central, invoking the contract, does not accept

or insists that it be paid in cane. (Case of *Miguel A. Márquez*, 279, 1957.)[3]

What reasons have led the Board to adopt and maintain uniformly the last two rules? The clearness with which they have been stated by it make the paraphrases unnecessary.

"....we cannot interpret § 3 in such broad manner as to give a free choice to the colono as to the central that shall grind his cane and rescind valid crop-loan and grinding contracts thereby affecting adversely the industry in general and consequently impairing the public interest. The sugar centrals do not make crop-loan advances to the colono for the purpose of negotiating or making evaluations with the money lent him, but rather to acquire a supply of cane which will permit them to operate within their utmost technical efficiency.

"As we said in the case of *Pascual Bidot Machado* it would be going too far to interpret this condition of free grinding imposed on the colono as to render void every crop-loan and grinding contract effective more than one year. This Board, because of the wide experience of its members in the sugar industry, essential requisite to hold their office in the Board, pursuant to § 10, paragraph three of Act No. 426 of May 13, 1951, must necessarily take official notice of the following facts:

"1. Generally the colonos that are financed by the Centrals are persons who do not qualify for making loans in the ordinary sources of credit, as the only guarantee which they may offer is the proceeds of the cane to be produced with the money taken as a loan.

"2. In every program of cane cultivation, the first year is very expensive since there are no sprouts to reduce the expense of production per cuerda of cane. As a result, the net income obtained by a colono from its fall or spring canes (first cost of cane), is lower than the cost of production of said cane. The benefits generally accrue from subsequent harvests.

"Therefore, when a central finances a colono, it knows as a general rule, that its possibilities of collection, in the first

---

[3] The Board has applied said rules to numerous cases. See the following recent examples: *Isidro Rivera González*, Complaint No. 15 (1961); *Cooperativa Azucarera Los Caños*, Shifting of Grinding No. 165 (1961); *Jesús Ortiz Hernández*, Shifting of Grinding No. 294 (1961); *Antonio Meléndez*, Shifting of Grinding No. 136 (1960); *Juan González González*, Case No. 262 (1960).

year are very scarce and that they will increase when the colono cultivates and cuts the subsequent sprouts.

"This is the main reason why all crop-loan and grinding contracts generally involve more than one year of effectiveness. If the effectiveness of every crop-loan and grinding contract were limited to a single year, the centrals would refuse to finance all those colonos who did not have sufficient collateral to guarantee the total amount of his debt. This would affect fundamentally the whole agricultural credit program existing in Puerto Rico, with grave injury, not only for the colonos of cane, but also for the public interest in general.

"We agree that it is true that the crop-loan and grinding contracts might extend for a number of years such as would defeat the legislature intent of re-establishing the colono's freedom to grind his cane in the central he chooses. But until now said case has not come before us." Case of *Miguel A. Márquez,* pp. 14–16.

Those are, undoubtedly, cogent reasons, the result of reflection and experience.

A conscientious study [4] of the credit facilities in the country's agriculture confirm the Board's conclusions. It proves that: the sugar cane growers have a numerous sources of credit, public and private; they annually obtain around sixty million dollars as credit, of which the centrals contribute with some $12.6 millions; [5] the centrals generally extend credit for a short term so that the colonos may harvest the cane, and the contracts embrace the production, the crop and delivery of the cane to the centrals; the colonos are bound to pay with the crop; in the case of the sugar centrals they are also bound by grinding contracts that sometimes extend for several years; "The average and small growers have benefited from the competition between the centrals to obtain the greatest amount of cane for grinding. This has brought an increase of their lending activities in recent

---

[4] Perkins, *El Crédito y Problemas Afines en la Agricultura de Puerto Rico* (1956).

[5] It does not include what the centrals of the Land Authority and the cooperatives contributed.

years"; [6] and those who do not have made loans from the sugar centrals find difficulty in obtaining credit when they do not have adequate and acceptable collaterals. It is finally stated that "from the 15,500 colonos who ground their cane in 27 centrals in the year 1956, 10,700, or 60 per cent, used the central as their source of credit. The weight of their canes was, however, approximately 3,800,000 tons or about 50 per cent of the 7,700,000 tons ground by all the colonos. This means that the colonos who obtained crop loans from the centrals were under the average in size." [7] The aforesaid findings show the important role played by the credit facilities offered by the centrals to the cane growers and particularly to the average and small ones. It is evident that the Board acts with great wisdom when it adopts an interpretation of § 3 of the Sugar Act which properly protects those indispensable sources of credit.

We must add to the foregoing that it is impossible to believe that it was the legislative intent to avoid, by such a narrow provision as § 3 of the Sugar Act, the contractual obligations assumed under an act of such vital importance for the sugar industry and, therefore, for the country's economy, as the Agricultural Loan Act of 1910 (5 L.P.R.A. §§ 164–180). To approve that result we would undoubtedly need a more specific legislative declaration. [8]

However, why does the Board prohibit the shift of grinding when the colono is indebted to the central, but authorizes it, as in the case at bar, when there is no debt? In both

---

[6] Vol. I, p. 70.

[7] Vol. II, p. 81. It is convenient to know that as the cited report says "The sugar cane is produced in 19,500 farms, 15,000 of which are less than 10 acres and collect about a 10 per cent of the harvest. The remaining 4,500 farms produce the 90 per cent of the cane which is harvested. Vol. I, p. 67.

[8] After 1951, year in which the Sugar Act was approved, a few amendments have been made to the Agricultural Loan Act without stating the intention of limiting its effects. See 5 L.P.R.A. Cumulative Supplement 1960 §§ 164–169 and 176.

cases, the contract has not expired, and, therefore, the obligations contracted thereunder and the known special protections granted by the Agricultural Loan Act, are still in effect.

As we previously pointed out, the Board based its view on its opinion in the cited case of *Central San Vicente* (known also as the *Laborde* case), as it was affirmed by this Court. We should therefore study said opinion.

The Board's resolution in said case considers the various provisions of the aforesaid Loan Act and concludes that it has "no provision providing for the resolution or termination of the contract by virtue of the payment of the crop-loan credit". Notwithstanding this and based on a very particular interpretation of §§ 1044, 1208 and 1210 of the Civil Code, the Board adds that although the contract of successive lien is valid and has mutual loans, the grinding obligation of the colono ceases when the central accepts the payment of the entire debt. It adds that the central's obligation of making crop-loan advances to the colono ends when the colono notifies the transfer of his grinding. After making reference to its policy of protecting the preference credits of the centrals for advances for agricultural purposes, due to the importance of the sugar industry and of pointing out that the sugar centrals are not engaged in the banking business and that if they do business of that sort is to insure the supply of sufficient cane, the Board says: "But notwithstanding all these arguments we must interpret the Sugar Act in effect as it is written, and on the basis of reasons of social utility and public order and § 3 of said Act specifically and clearly provides, *without any limitations whatsoever*, the colono's freedom to choose the central where he wishes to grind his cane". (Emphasis added.) And further on: "The clearness of the aforesaid provisions does not permit any other interpretation because that would be contrary to the basic principles of the Sugar Act in effect, whose

purpose was, among others, to guarantee the colono's free-dom to choose the central where he wishes to grind his cane and in granting the colono said freedom, to permit him to obtain a greater proportionate distribution, than the mini-mum share fixed by law, in the product of his cane."

In our opinion, in the cited case of Central San Vicente we considered it unnecessary to decide the aforesaid question because the parties had expressly included in the contract the provisions of the Sugar Act and therefore those of § 3, and the central, thus, had thereby recognized the colono's right to shift the place of grinding after complying with the notification requisite. We must now decide said question.

It should be first noted that the Board uses a dual approach in passing on the two situations under our con-sideration. In the case where the colono owes to the central all or part of the crop loan, the Board states that the freedom of changing the place of grinding may not be absolute, and points out the adverse effects that would work upon the sugar industry a rule limiting the crop-loan and grinding contracts to only a year. However, when the situation is exactly the same, except that on a particular year during the term of the contract, the colono has paid the pending debt, the Board then lays emphasis on the freedom of grinding provided by § 3 —"without any limitations whatsoever"—disregarding the economic factors which prompted the Board to protect the execution of contracts for more than one year and invokes an interpretation of the general law of contract in order to permit the shift of grinding.

Notwithstanding this, a slight consideration of the matter will show that the economic factors that are controlling in the first case are just as valid in the second. To the latter one may unquestionably apply the same considerations that: 1. the central does not finance the colonos to do business with the money lent to them, but rather to acquire a supply of

cane that will permit them to operate within the utmost technical efficiency; 2. the colonos financed by the centrals are persons that do not qualify to make a loan from ordinary sources of credit, because they lack the collateral and may only offer their cane as guarantee; 3. when the contract is signed, the central as a general rule knows that it is taking the risk of not being able to collect the debt during the first year. We do not believe, therefore, that as to these controlling factors and to the general effects on the credit facilities in the industry, there exists any difference between both situations.[9] The Board certainly places these basic considerations on the same footing of a mere additional measure to compel the payment of the agricultural advances, when it limits its application merely to cases of nonpayment by the colono.

Neither is the Board's interpretation of the contract act correct. Certainly it cannot be said that the only consideration of a crop-loan and grinding contract for the central is the payment in money or specie to which the colono is bound. More important to the central, as the Board itself accepts, is the colono's obligation to supply for some years part of the "sufficient canes which will allow it to operate within its utmost technical efficiency". This obligation does not terminate merely because at a particular moment during the contract, the colono is in a position where he owes nothing to the central.[10] This is so, particularly in a case such as

---

[9] The contradiction is even clearer in the case in which the colono offers to pay in money and the central, based on the contract, demands cane. The Board prohibits the shifting of grinding in said case and again invokes the economic factors enumerated in the text.

[10] It had been thus originally decided by the Board. In the case of Félix M. Dávila Vega, 0–5 (1953) the central and the colono executed a contract for agricultural advances and grinding for the 1952, 1953 and 1954 crops. In 1952 the colono sold the farm described in the contract to another person, when he had already paid his debt to the central. The Board decided that the contract was valid and that it bound the new owner because it had been duly recorded. The Board unanimously decided said legal matter as follows:

the present one, in which the parties expressly agreed that the colono would not be relieved of his obligation "by the fact that he had paid or did not owe any crop loans to the central".

In the *Laborde* case as well in the present one, the Board bases its opinion on the application of the maxim *rebus sic stantibus*, adducing that the "basic circumstance which created the original contract have varied due to the acceptance of the payment of the agricultural advances" by the central. This principle is obviously erroneous, even in the hypothesis that the cited doctrine was effective in our law. *Cf. Rodríguez* v. *Municipality*, 75 P.R.R. 449, 461–462 (1953). An apt commentary upon the matter explains that "the clause of 'rebus sic stantibus' may be exclusively applied to those cases in which, due to grave, unforeseen and unpredictable events the compliance by one party of his contractual obligation, although possible, becomes excessively onerous or ruinous". Álvaro Calderón, Jr., *La Cláusula Rebus Sic Stantibus y el Riesgo Imprevisible en el Derecho Puertorriqueño*, 19 Rev. Col. Ab. P. R. 5, 7, 15 (1958). The case we now consider is not a case of "grave events", and

"The contractual obligations of the parties and their successors in title, as they appear in the contract, consist, on the part of the central, in being willing to make agricultural advances during the term of the contract, and on the part of the colono in grinding his canes in said central during the same time. The central was willing, during the 1953 crop and also for the 1954 crop, to make the agricultural advances specified in the contract and it so informed the colono. Therefore, the central complied with its obligation, and the fact that the colono did not use said financing does not relieve him of his obligations towards the central, for the Agricultural Loan Act requires the colonos to comply with all their contractual obligations. That is, the Act does not limit the obligation to the payment of the crop-loan debt, but rather full compliance with what was lawfully contracted (§ 5 of the Agricultural Loan Act). If the colono has not wished to make use of the advances, that is his own business, but it does not relieve him from the obligation of grinding the cane produced in the farm, object of the contract, in the contracting central, because this obligation is not conditioned to the use of the agricultural advances offered and guaranteed".

Later as we have seen, the Board changed its view.

much less "unforeseen and unpredictable", and the fulfillment of the obligation to grind the cane in the contracting central in no way "becomes excessively onerous or ruinous" for the colono.

■ The intervener points out that in the event there existed the obligation on the part of the colono to continue grinding his canes in the mill of the contracting corporation, said obligation should not be however extended to the lessee. The legislature anticipated this situation when it provided the following in § 8 of the cited Loan Act.

"If after the recording of a contract for agricultural advances and the grinding of cane, the cane which is the object of the contract, or any interest therein, or the factories or centrals at which the said cane is to be ground, shall be transferred voluntarily or by operation of law, the transferee shall be bound to fulfill all the obligations of the contract and shall be liable for non-performance thereof in the same manner and to the same extent as the contracting parties; it being understood that no transfer shall release the contracting parties from their obligations or liabilities under the contract."

Said obligation prevails even when the verb "to lease" is not included among those of "to sell, to give, to barter [and] to mortgage" in the clause of the contract which binds the colono not to carry out said acts except on condition that the third person "be bound to respect in all its parts" the contract. The obligation of the lessee springs, as we have previously seen, from the promise, protected by the Agricultural Loan Act, made by the lessor.

■ Neither is the contract null because it included a clause which binds the colono to keep "good cultivating conditions" and to deliver "good and healthy" cane to the central. The ruling in *Mayagüez Sugar Co.* v. *Sugar Board*, 78 P.R.R. 844, 849, 850 is not applicable.

In brief, the analysis we have made of the problem leads us to the following conclusions:

1. Neither from the language of § 3 of the Sugar Act nor from the legislative history it does not appear that the freedom recognized to the colonos for the shift of grinding place for his cane may not be object of a reasonable contract by them.

2. Since the approval of the Act until now, the body in charge of its administration has acknowledged, considering the powerful economic and legal reasons already stated, that said freedom cannot be absolute and that in certain circumstances the colono may in the exercise of his free will, fix limitations.

3. When the contract between the central and the colono is exclusively for grinding and the central is merely bound in said contract to fulfill its duties and to pay the compensation fixed by law, it must be understood that the colono has not limited his right to change annually the grinding of his canes, since there is not, at least in real economic terms, any consideration for his obligation [11] and the colono's freedom would be limited without any benefit to the colono. Furthermore, it is obvious that the vital economic factors, already described in this opinion, may only be effective if the central extends credit to the colono.

4. When the contract is one for agricultural advances and grinding or one in which the colono receives additional compensations to that already fixed by the Sugar Act and is not contrary to the provisions or to public policy of said Act the colono is bound to fulfill his promise freely contracted by him, of grinding his canes at the mill of the contracting central, during the years specified and independently of whether in some of those years he had fully paid in cane or money the loans made by the central up to said date.

■■ It is a well-established rule of this Court to give "great consideration and respect" to the conclusions and interpretations of the specialized administrative agencies. *Colonos de Santa Juana* v. *Sugar Board*, 77 P.R.R. 371, 374 (1954) and judgments cited therein. That attitude becomes more evident when we review the decisions of certain agencies

---

[11] In Álvaro Calderón, Jr., *Obligaciones y Contratos—Existencia o Inexistencia de Causa en Obligaciones Impuestas por Ley*, 16 Rev. Col. Ab. P. R. 111 (1956) it is stated that there is no consideration, as a technical matter, under the law of obligations. It is unnecessary to decide that problem.

which are in charge of the regulation of the complex technical, social or economic procedures. But the cited rule unfortunately is not sufficient in itself to define the relations that should exist between the administrators and judges in the difficult and at times painful duty of judicial review.[12] We understand that the former have the initial and primary responsibility of framing the rules, that they are delegates for said purposes of the Legislative Assembly with authority to regulate important economic activities under broad legislative mandates, that ordinarily they are selected for that task because of their known capacity and experience, that in their daily performance of said activities they develop a special sensibility which renders their diagnosis and their remedies more trustworthy, and that the elementary principle of the division of work plus the respect to the legislative confidence conferred onto said administrators should mitigate the judicial anxiety of rendering the "best" solutions. But the judges also receive a legislative mandate of reviewing the administrative acts, which they must duly fulfill. They also have, in a far greater degree than the administrators, the opportunity of framing these controversies within a broader ambit, where the controlling consideration must be the continuous maintenance of a strict system of law in the community enhanced by the indispensable public faith in the administrative and judicial procedures.

No problems of significance arise in this area when the administrative conduct is obviously illegal, arbitrary, whimsical or unreasonable, or when it is performed outside the clear constitutional or statutory procedural requisites. It is when it constitutes, as in this case, an expression of a reasoned criterion and the proper procedural steps are followed that perplexities arise. The solution, of course, may

---

[12] With respect to this matter examine the excellent discussion which may be found in 4 Davis, Administrative Law Treatise pp. 189–270 (1958).

not be reduced to an infallible axiom, good for all occasions. The circumstances of the law, activity, facts and time, will necessarily affect in a decisive manner the final result. But as a basic norm the courts have the obligation of demanding that the administrative conclusion be based explicitly on reason and the law and that it be part of an integrated and reasonable pattern of regulation. Said norm is not followed when contradictory solutions are rendered for fundamentally identical situations.

The order appealed from will be reversed and the case remanded to the Sugar Board for further proceedings compatible with this opinion.

Mr. Chief Justice Negrón Fernández and Mr. Justice Belaval did not participate.